# STATE OF MICHIGAN

# COURT OF APPEALS

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

KENNETH WADE PENLEY,

        Defendant-Appellant.

UNPUBLISHED
December 20, 2018

No. 336680
Berrien Circuit Court
LC No. 2016-002467-FC

---

Before: SAWYER, P.J., and STEPHENS and GADOLA, JJ.

PER CURIAM.

Defendant appeals by right his jury convictions for one count of first-degree criminal sexual conduct (CSC), MCL 750.520b, one count of second-degree CSC, MCL 750.520c, and one count of assault with intent to commit CSC involving sexual penetration, MCL 750.520g.[1] On December 21, 2016, defendant was sentenced as a habitual fourth offender, MCL 769.12, to serve concurrent terms of 180 months to 360 months for the CSC convictions, and 120 months to 360 months for the assault conviction. Defendant filed a Motion for a New Trial or for a *Ginther*[2] evidentiary hearing on June 22, 2017, arguing that his counsel was constitutionally ineffective. A *Ginther* hearing was granted, and held on September 6, 2017. On January 2, 2018, the trial court issued an opinion and order denying the motion for a new trial. Defendant appeals from that order and we affirm.

## I. BACKGROUND

Defendant's convictions arise from his sexual assault of his son, DK. Defendant's and DK's biological mother, Dana Kiser's parental rights were terminated to DK when DK was two years' old, but DK ended up in defendant's custody in the fall of 2015 when he was 13 years' old because DK's maternal grandfather thought defendant should be involved in DK's life. It was while living in a two-bedroom trailer with defendant, defendant's mother Iva Penley, and defendant's then girlfriend, Melissa Watson, that DK was sexually assaulted by defendant.

---

[1] He was acquitted of the same three charges arising from a second sexual assault with the same victim.

[2] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

At trial, DK alleged he was assaulted on two separate occasions. He testified that both instances occurred in the bedroom DK, defendant and defendant's girlfriend sometimes shared. DK testified that while he actively struggled against the first attack, he succumbed to the second without resistance. In both cases, DK testified that the defendant referred to DK as being "gay" and gripped his genitals, causing him significant pain. DK testified that after the first incident, he went into the living room and told Iva what defendant had done to him, and that Iva just smiled. This reaction caused DK not to tell Iva about the second incident. After the first assault, DK began to experience painful urination, blood in his urine, and testicular pain and swelling. Dr. Ryan Stringer testified that DK was brought to the emergency room in March 2016 by Dana and was diagnosed with acute urinary retention and inflammation of the testicle. Dr. Stringer testified that DK returned to the emergency room the following month with the same complaints. While antibiotics had been prescribed at the first visit the defendant never filled that prescription. Dr Stringer again treated DK and prescribed a new round of antibiotics. This time however, Dr. Stringer filed a report with Children's Protective Services (CPS) based on his discussions with Dana regarding defendant's custody of DK and defendant's failure to fulfill DK's prior antibiotic prescription. Dana and DK's two older brothers Samuel and Kenneth, testified that after returning from the second emergency visit, DK disclosed to them that defendant had assaulted him. DK testified that he decided to disclose the abuse because he thought his family and doctors would eventually learn the truth and that if he told, he would not have to return to live with defendant. Dana testified that CPS arrived quickly thereafter and removed DK from her home. CPS worker Alexandra Heit testified that she referred DK to the Child Assessment Center (CAC) to be forensically interviewed by Amelia Harper and took him to a local CPS office where he was interviewed by Officer Wesley Koza. DK was also examined by sexual assault nurse examiner (SANE) Teresa Yoakum.

Defendant's trial theory was that DK fabricated the assaults. Defendant, Iva, defendant's sister Tammy Wilson, and defendant's prior girlfriends Watson and Emily Horvath also testified in defendant's favor. All of those witnesses denied ever seeing anything untoward between defendant and DK. Iva specifically denied that DK reported the first assault to her.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

### A. ISSUE PRESERVATION

An ineffective assistance of counsel claim is preserved when defendant moves for a new trial or *Ginther* hearing in the trial court. *People v Payne*, 285 Mich App 181, 188; 774 NW2d 714 (2009). However, he raises two issues before this Court on appeal that were not presented to the trial court in those motions nor raised at the hearing. The unpreserved issues were that trial counsel abandoned potential helpful information and failed to object to defendant being shackled. Defendant's ineffective assistance issue is therefore partially preserved.

### B. STANDARD OF REVIEW

"Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law." *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). "The trial court must first find the facts and then decide whether those facts constitute a violation of the defendant's constitutional right to effective assistance of counsel." *People v Matuszak*,

263 Mich App 42, 48; 687 NW2d 342 (2004). "We review the trial court's factual findings for clear error. Clear error exists if the reviewing court is left with a definite and firm conviction that the trial court made a mistake." *People v Armstrong*, 490 Mich 281, 289; 806 NW2d 676 (2011) (internal citation omitted). "[W]e review de novo questions of constitutional law." *People v Unger*, 278 Mich App 210, 242; 749 NW2d 272 (2008). We also "review de novo the trial court's determination of prejudice." *People v Dendel*, 481 Mich 114, 132 n 18; 748 NW2d 859 (2008). "This Court reviews unpreserved claims of ineffective assistance of counsel for errors apparent on the record." *People v Johnson*, 293 Mich App 79, 90; 808 NW2d 815 (2011).

"A trial court's decision to grant or deny a motion for a new trial is reviewed for an abuse of discretion." *People v Blackston*, 481 Mich. 451, 460; 751 NW2d 408 (2008) (citation omitted). A trial court abuses its discretion when its decision falls outside the range of principled outcomes. *People v Terrell*, 289 Mich App 553, 559; 797 NW2d 684 (2010).

## C. ANALYSIS

Defendant argues nine instances where trial counsel was ineffective. We have aggregated these claims into three categories: 1) failures to object, 2) unreasonable trial strategy, and 3) shackling.

To establish an ineffective assistance of counsel, defendant must show "(1) the performance of his counsel was below an objective standard of reasonableness under prevailing professional norms and (2) a reasonable probability exists that, in the absence of counsel's unprofessional errors, the outcome of the proceedings would have been different." *People v Sabin*, 242 Mich App 656, 659; 620 NW2d 19 (2000). "There is a presumption that defense counsel was effective, and a defendant must overcome the strong presumption that counsel's performance was sound trial strategy." *Johnson*, 293 Mich App at 90. "Decisions regarding what evidence to present, whether to call witnesses, and how to question witnesses are presumed to be matters of trial strategy, as is a decision concerning what evidence to highlight during closing argument." *People v Horn*, 279 Mich App 31, 39; 755 NW2d 212 (2008) (internal citations omitted). "We will not substitute our judgment for that of counsel on matters of trial strategy, nor will we use the benefit of hindsight when assessing counsel's competence." *Unger*, 278 Mich App at 242–243. "Judicial scrutiny of counsel's performance must be highly deferential." *Strickland v Washington*, 466 US 668, 689; 104 S Ct 2052; 80 L Ed 2d 674 (1984).

### 1. FAILURE TO OBJECT

Defendant argues that counsel was ineffective for failing to object to certain testimony from Dana, DK and Yoakum. Defendant first argues that defense counsel was ineffective for failing to object to Dana's testimony that when she and defendant were married, he preferred anal sex, they had anal sex daily, and that at times, the anal sex was "rough." We agree. At the *Ginther* hearing, trial counsel testified that he should have objected to this testimony and that he realized this after the fact while still in trial, but at that time did not want to emphasize the point. He conceded there was no trial strategy in his failure to object. The prosecutor agrees that the testimony should not have come in, and that an objection from counsel would have just drawn more attention. The trial court echoed these points, finding in its opinion and order that the

testimony was improper, but that defense counsel was not ineffective for failing to object because of the risk of highlighting the testimony.

The testimony was not relevant to any fact at issue, and it did show that defendant had a "lustful disposition" for anal sex. See *People v Sabin*, 463 Mich 43, 60–61; 614 NW2d 888 (2000) ("Unlike the courts of other jurisdictions, we have never adopted the so-called 'lustful disposition' rule, which allows the use of other acts for propensity purposes in sex offense cases."). Trial counsel, the prosecutor and the trial court reasoned that objecting to the testimony would have given it more emphasis. It is true that "there are times when it is better not to object and draw attention to an improper comment," *People v Bahoda*, 448 Mich 261, 287 n 54; 531 NW2d 659 (1995). The court ultimately found that while admission of the testimony was erroneous, the decision not to object was a matter of trial strategy. We cannot conclude that the trial court's decision was outside the range of principled outcomes in this case.

Testimony regarding the suicide death of DK's brother, BK, is the focus of defendant's next claim of error. Both DK and Nurse Yoakum testified in this regard. DK testified in response to the prosecutor's question as to how many siblings he had, that he had a sibling named BK whom he forgot to mention on the first day of trial because BK committed suicide a few years prior at the age of sixteen. Yoakum, the forensic nurse, was questioned about the extent to which she questioned DK on the exact date and time of the assaults. She responded that she did not do so because DK shut down after telling her that BK committed suicide and left a note indicating that the reason was that he did not want to be like defendant. At the *Ginther* hearing, trial counsel testified that he discussed the issue of BK's suicide with defendant before trial. Trial counsel testified that defendant wanted the jury to know that BK had committed suicide so that he could explain the context of a recorded jail conversation where he asked Emily not to tell his son Kenneth that a jacket defendant gave Kenneth had once belonged to BK. Trial counsel also testified that defendant indicated that he would bring up BK's suicide to show that because he had just lost a son, he would not have done anything to lose another child.

Again, the trial court found that counsel was not ineffective in either instance. That decision was based, in part, on the trial court finding that counsel was credible in reporting the conversation with the defendant regarding the plan to contextualize the jailhouse recording and earn empathy for his loss. Secondarily, the trial court found that the strategy was not unreasonable. We defer to the court's fact-finding that counsel had discussed the issue with the defendant and they jointly decided to disclose the suicide. We agree that it was not unreasonable to attempt to place the jailhouse conversation in a more favorable context and not clear error for the court to find that this was the agreed upon strategy. The fact that this strategy was not successful did not render counsel ineffective. *People v Stewart (On Remand)*, 219 Mich App 38, 42; 555 NW2d 715 (1996).

The argument regarding Yoakum goes beyond the fact of the suicide and raises the inferences as to the reason for the suicide. Defendant argues that Yoakum's testimony, that it was reported to her by DK that BK left a note saying that he did not want to be like the defendant, should have drawn an objection and that the failure to object prejudiced him both at its initial utterance and was later compounded by prosecutorial arguments in closing. At the *Ginther* hearing and here, defendant's argument is based upon the assertion that the jury inferred that "did not want to be like" the defendant meant that BK was a victim of assaults like DK. The

trial court specifically noted that the testimony from Yoakum did not offer any explanation or further exposition as to the meaning of "not be like" the defendant. Given that there was little testimony about BK and none about him being assaulted by anyone, we concur with the trial court that more likely than not the jury surmised the reference was to the defendant's other known dysfunctional characteristics. Defendant also claims that counsel's failure to object to Nurse Yoakum's testimony led to the prosecutor making a correlation in closing argument between being sexually assaulted and having suicidal thoughts, which defendant argues was a specific reference to BK. The record clearly shows however, that the prosecutor was arguing about DK's suicidal ideation and not BK's. There was no mention of BK. Still, defendant argues that trial counsel should have objected to Nurse Yoakum's testimony because this later argument by the prosecutor was irrelevant where DK never testified he was suicidal. Indeed, DK did not testify that he was suicidal, but defendant fails to recall the testimony from DK's grandfather David that after DK's second counseling appointment, the counselor suggested DK be taken directly to the hospital because DK reported that he was afraid he was going to hurt himself. Additionally, as noted by the trial court, the prosecution's witness on the behavior of sexual assault victims, referenced suicidal ideation being among the typical post-assault behaviors.

Defendant next argues that trial counsel was ineffective for not objecting to hearsay testimony from Amelia Harper, Nurse Yoakum and Officer Koza regarding DK's out-of-court descriptions of his assault that were later used by the prosecution to bolster DK's credibility. We find that this argument was abandoned in the trial court and again on appeal. In the trial court, Defendant's Amended Reply Brief in Support of Motion for New trial provided, "this is an area in which the defense has come to agree with the prosecution." On appeal, defendant fails to identify which statements were hearsay and why. For these reasons, we consider defendant's hearsay issue abandoned.[3] "It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *Mitcham v City of Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959).

Defendant additionally argues trial counsel was ineffective for not objecting to the following testimony from the prosecution's child abuse expert Brooke Rospierski on cross-examination and redirect examination that defendant argues vouched for DK's credibility. First on cross-examination:

> *Q.* Okay. So, based upon your review of the report that you did, the forensic interview, is there anything to suggest one way of the other whether consistency was an issue or might be an issue?
>
> *A.* When I reviewed that report, the Michigan protocol was followed. [DK] provided free narrative of the sexual abuse that occurred by his father.

---

[3] See e.g. *Mitcham v City of Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959) ("We are told in the brief that the claimed faulty instructions may be found elsewhere, but we are not told what these instructions were, why they might be faulty, or precisely where to look for them. This is insufficient to present these questions for consideration in this forum.").

During that interview I thought that he was consistent in his statements. He provided several sensory details of what had happened to his body. And I consider that, what he said during that inter – a valid disclosure of sexual contact.

And again, on redirect:

*Q.* And, again, from reviewing the interview of [DK], he provided a valid disclosure?

*A.* Correct.

*Q.* And why was that?

*A.* Well, [DK] was able to talk very openly about that interview. You know, Ms. Parker [sic] asked, "Why are you here today?" and [DK] was able to walk her through what had occurred. He provided a lot of specific details and sensory details to that interviewer. At no time did Ms. Harper, you know, put words in his mouth or ask direct questions; your know, "Did you [sic] dad sexually abuse you?" Those were valid responses used by her.

At the *Ginther* hearing, trial counsel testified that he did not object to the testimony because he understood Rospierski's use of the word "valid" as relating to whether the procedure used to gain the disclosure was in accordance with the protocol. The trial court agreed, finding that trial counsel was not ineffective because there was no need for trial counsel to object.

In a CSC case involving a child, an "expert may not testify with regard to whether the victim's allegations are truthful or whether sexual abuse in fact occurred." *People v Garrison*, 187 Mich App 657, 658; 468 NW2d 321 (1991). Read in context, Rospierski's testimony did not vouch for DK's disclosure as being truthful. Rospierski's earlier testimony went over the different phases of the interview process and one of them was the free narrative where the child was asked an open-ended question like, "Tell me why you came here to talk to me today." Rospierski explained that after the child "talked about everything they're able to," the interviewer would ask clarification questions like, "What happened next?" to prompt details of the incident. Rospierski testified that the protocol was designed "to not put words into kids' mouths." She explained, "I never want to provide them with a response or prompt a false disclosure, and that's why we never ask those direct questions that occur, so that we can get the most information from those children." The first answer elicited on cross-examination referred to DK's narrative as a valid disclosure, and not a false disclosure, because the protocol to obtain the free narrative was followed. In the redirect portion of Rospierksi's testimony, she was again asked whether DK made a valid disclosure and again Rospierski testified that the free narrative process was followed with an open-ended question that prompted a narrative from DK with details in his own words. In either instance, Rospierski's use of the word "valid" referred to the process by which the disclosure was obtained and not to what DK actually said. Trial counsel's decision not to object was objectively reasonable and defendant was not prejudiced by the testimony because it did not vouch for DK's credibility.

Defendant last argues that trial counsel was ineffective for failing to object to the prosecutor's mischaracterization of medical testimony from Dr. Stringer and Nurse Yoakum in

-6-

her closing argument. At the *Ginther* hearing, trial counsel testified that he did not object to the prosecutor's characterization of medical evidence during closing argument because the closing argument was just the prosecutor's interpretation of the evidence and the jury would be told that the attorney's arguments were not evidence. The trial court held that defendant's contention that the prosecutor mischaracterized the medical evidence from Dr. Stringer was unsupported by the record and later concluded that if there was a misstatement by the prosecutor, it was minor. The trial court held that the prosecutor did not misrepresent Nurse Yoakum's testimony because the blue and yellow coloring was consistent with bruising. The prosecutor argued in closing:

> He told you how his diagnosis was orchitisepidiymo, and how the three causes of this diagnosis come from some sort of infection, come from some sort of sexually transmitted disease, or trauma. He told you all how you are able -- or he's able to rule out with a high degree of certainty that [DK] did not have an infection, because there was no evidence of an infection; no fever, no chills. He went through a whole list about how there was no evidence for that, as well as with a high degree of certainty you can rule out STD because [DK] tested negative for that.

> So, what we're left with, ladies and gentlemen, is trauma, and it's a type of trauma that Dr. Stringer said can be caused the way that [DK] says it was caused: by grabbing the testicles and squeezing them. . .

Defendant contends this was a mischaracterization of the evidence because the prosecutor argued that every other potential cause was eliminated except trauma when Dr. Stringer actually testified that he found no physical evidence of trauma, that viruses could not be eliminated and that he did diagnose DK with an infection. We disagree. At trial, the prosecutor asked, "Okay. And we are able, though, to rule out at least two other causes with high degree of certainty" and Dr. Stringer answered, "Correct." Thus, the prosecutor's later argument in closing, that Dr. Stringer was able to rule out with a high degree of certainty the two other causes was not a mischaracterization of the evidence.[4] In this case, trial counsel did not have a reason to object and this Court will not find counsel "ineffective for failing to raise meritless or futile objections." *People v Putman*, 309 Mich App 240, 245; 870 NW2d 593 (2015).

Defendant also argues that the prosecutor misrepresented Nurse Yoakum's testimony to argue that the yellow color on DK's penis and blue color on his anus were indicative of bruising when Nurse Yoakum testified that because the colors were not gone two weeks later when she reexamined DK, they were not indicative of bruising.

The prosecutor argued in closing:

> She also talked about her findings form the examination she did on DK's genitals, how she found yellow color noted on his penis, and a bluish color in his

---

[4] In his brief, defendant goes beyond the record to define orchitisepidiymo to conclude that DK had an infection. That evidence was not produced at trial and will not be considered.

anal area. She told you how it's consistent with bruising, but she can't tell you when the bruised happened. She can't tell you that. But, again, that's another thing that is consistent with what DK says happened. He says his penis was grabbed, and he has this yellow coloring on his penis. And he also had this blue coloring on his anal area, just like DK said happened. It's from what DK said happened.

Nurse Yoakum testified that at the first exam, she was unsure whether the yellow color was bruising. She testified that she reexamined DK to look again at the areas where she documented discoloration "because typically if it's bruising, in two weeks that bruising will be gone." She testified that the discoloration was still there. Nurse Yoakum did not opine how the yellow and blue colors came to be and acknowledged on cross-examination that inserting the catheter, as well as the catheter becoming dislodged could cause bruising on the penis. The reasonable conclusion drawn from Nurse Yoakum's testimony was that the yellow and blue coloring on DK's genital and anal areas was natural pigment. The prosecutor misrepresented the evidence when she argued that Nurse Yoakum testified the colors were from bruising. Trial counsel could have, but was not required, to object to the misrepresentation during the prosecutor's closing. As trial counsel stated at the *Ginther* hearing, the prosecutor's closing argument was merely argument and the jury would be instructed that the prosecutor's arguments were not evidence. "It is well established that jurors are presumed to follow their instructions." *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998). Moreover, this jury asked for all the evidence, exhibits and recordings at the beginning of its deliberations. Further, while trial counsel's decision whether to highlight the misrepresentation in defendant's closing argument was a matter of trial strategy, trial counsel did argue that there was no explanation for the discolorations. Defendant cannot establish that he was prejudiced by the misrepresentation.

The only instance where the trial court's deference to the trial strategy of the counsel was erroneous was relative to the testimony regarding the defendant's sexual relationship with Dana. Even if counsel's performance was objectively deficient, defendant must show that trial counsel's performance prejudiced him in order to establish ineffective assistance of counsel. "At issue in a claim of ineffective assistance of counsel is whether counsel's failure to object to the improper evidence was constitutionally deficient, and if so whether that failure prejudiced the defendant." *People v Randolph*, 502 Mich 1, 12; 917 NW2d 249 (2018). Prejudice is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 US at 694. Trial counsel's failure to object to Dana's testimony was not outcome determinative. As the trial court mentioned, Dana's testimony was brief and not the focus of closing argument. DK gave detailed accounts of being sexually assaulted by defendant that were corroborated by other family members and buttressed by medical and mental health professionals. Defendant emphatically denied the allegations. The jury simply believed DK. Trial counsel's failure to object to Dana's testimony does not undermine confidence in the verdict given the overwhelming amount of other properly admitted evidence in support of the jury verdict.

## 2. TRIAL STRATEGY

Defendant also argues that trial counsel's "we have nothing to hide" strategy was unsound because it had defendant introduce a criminal history that was otherwise inadmissible, abandoned potentially helpful information, and lowered the burden of proof.

Counsel may be found ineffective when his chosen strategy is determined unsound or unreasonable. *People v Dalessandro,* 165 Mich App 569, 577–578; 419 NW2d 609 (1988). "A sound trial strategy is one that is developed in concert with an investigation that is adequately supported by reasonable professional judgments." *People v Grant*, 470 Mich 477, 486; 684 NW2d 686 (2004). "[T]he Sixth Amendment guarantees a range of reasonably competent advice and a reliable result. It does not guarantee infallible counsel." *Leblanc*, 465 Mich at 592. We also recognize that "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Strickland*, 466 US at 688-689.

Defendant specifically points to trial counsel's purposeful admission of prior convictions from 1990, 1993, 2005, and 2011, and argues that they should have been excluded under MRE 609.[5] At the *Ginther* hearing, trial counsel testified that his decision to admit these convictions was strategic to show that defendant had never been convicted of a sex crime. Trial counsel's decision to introduce defendant's prior criminal history may constitute a matter of trial strategy. *People v Murph*, 185 Mich App 476, 479; 463 NW2d 156 (1990), mod on other grounds 190 Mich App 707 (1991). Further, admitting guilt to some crimes, while maintaining innocence to others has been recognized by this Court as a risky but permissible trial tactic to improve defendant's credibility. *People v Wise*, 134 Mich App 82, 98; 351 NW2d 255 (1984). Given the circumstances, trial counsel's strategy was not unreasonable. The termination of defendant's parental rights and his fractured relationship with his children was a matter of some relevance to this case and the termination was, in part occasioned by defendant's incarcerations. Allowing evidence of convictions that were otherwise inadmissible was a risky strategy. However, given the fact that his criminal history was likely to be referenced, we cannot say that the trial court's determination that it was not unreasonable to, at least demonstrate that defendant had no history of criminal sexual assault was outside the range of principled outcomes. It is a closer question as to how this affected the outcome of the trial. But, given that the defense was able to prevail on one of the two sexual assault counts, it is likely that the outcome of the trial would not have been different had counsel chosen not to introduce defendant's prior convictions.

Defendant also faults counsel for failing to object to testimony from DK that defendant had been in prison before, and from Tammy that defendant was violent toward his past girlfriends. Defendant further complains that the court instructed the jury that it could consider

---

[5] MRE 609(c) reads: "Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date."; See also *People v Allen*, 429 Mich 558, 596; 420 NW2d 499 (1988) ("[P]rior convictions for non-theft crimes which do not contain elements of dishonesty or false statement should never be admitted into evidence.").

defendant's past convictions when determining whether to believe defendant or not. At the *Ginther* hearing, trial counsel's reason for allowing this testimony was again, because his concern was only showing the jury that defendant did not have a criminal history involving sexual assault. It is quite likely that the age of the domestic violence would have made it inadmissible however, it is clear that trial counsel failed to consider even the impact of the domestic violence issue. Counsel did not appreciate the similarity between the CSC charges and prior domestic violence conviction as assaults against a domestic relative, and this was below the acceptable standard of performance. There was no strategy involved. However, the testimony was limited, not the subject of argument and not likely a significant factor in the outcome of the case.

Defendant also argues that trial counsel was ineffective for abandoning potential helpful information that DK had twice previously claimed he was sexually assaulted and those allegations were proven false. Defendant is referring to the prosecution's preemptive Motion in Limine to Exclude Evidence of Victim's Sexual Conduct under MCL 750.520j where defendant had not filed a motion yet to admit such evidence, and defendant's answer "that on at least two prior occasions the victim has claimed to have been sexually assaulted and it was determine jis [sic] allegations were false." A hearing was held on October 13, 2016, where defense counsel stated, "I investigated part of that and it was not able to be substantiated, so I'm not gonna make that a big issue." Therefore, the court granted the prosecutor's motion.

"A defendant is entitled to have his counsel prepare, investigate, and present all substantial defenses." *People v Kelly*, 186 Mich App 524, 526; 465 NW2d 569 (1990).

> Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. [*Wiggins v Smith*, 539 US 510, 521–522; 123 S Ct 2527; 156 L Ed 2d 471 (2003), quoting *Strickland*, 466 US at 690–691.]

Our review of this claim is limited to errors apparent on the record, because it was not included in defendant's motion for a new trial or *Ginther* hearing. *Johnson*, 293 Mich App at 90. From the record, it is clear that trial counsel did not abandon potentially helpful information, but that he investigated the allegations and determined they were not substantiated.

Defendant lastly argues that the following argument from trial counsel's closing argument lowered the burden of proof:

> Let's – when you really boil this down to the trial itself – and I'm trying to make it easy – and by the way, I limited myself to 45 minutes … The real issue, ladies and gentlemen of the jury, is whether you believe [DK]. That's the real issue. All the rest of this stuff is a smoke screen, when it really comes down to it. If you don't believe [DK] then there's no way you can convict my client of anything. The only way you can convict my client is if you believed what [DK] said, and

we don't believe there's any evidence to suggest really that [DK] was telling the truth.

Defendant argues that trial counsel instead should have emphasized the concept of reasonable doubt to the jury. Trial counsel was free to argue defendant's theory of the case in closing argument. Some attorneys argue reasonable doubt; some attorneys argue the strength of the evidence. Counsel's decisions regarding "what evidence to highlight during closing argument" are presumed to be matters of trial strategy that this Court will not second-guess. *Putman*, 309 Mich App at 248.

Defendant's other numbered arguments related to the depth or lack of treatment trial counsel gave to issues in closing argument do not establish ineffective assistance counsel. Rather, defendant argues what counsel could have done differently. "There are countless ways to provide effective assistance," and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 US at 689.

### 3. SHACKLING

Defendant also argues that trial counsel was ineffective for not objecting to defendant being shackled. Our review of this claim is limited to errors apparent on the record, because it was not preserved below in defendant's motion for a new trial or *Ginther* hearing. *Johnson*, 293 Mich App at 90.

"In general, freedom from shackling of a defendant during trial has long been recognized as an important component of a fair and impartial trial." *People v Moore*, 164 Mich App 378, 384; 417 NW2d 508 (1987), judgment mod and remanded 433 Mich 851; 442 NW2d 638 (1989). "A court may order shackling of a defendant only on a finding supported by record evidence that shackling is necessary to prevent escape, injury to persons in the courtroom, or to maintain order." *People v Dunn*, 446 Mich 409, 411; 521 NW2d 255 (1994). A "defendant is not prejudiced if the jury was unable to see the shackles on the defendant." *Horn*, 279 Mich App at 36-37. Even "when jurors inadvertently see a defendant in shackles, there still must be some showing that the defendant was prejudiced." *Id*. at 36.

Defendant waived this issue at trial. Defendant was in leg restraints that were chained to the floor and the court arranged for defendant to be taken out of the courtroom before the jury entered and exited so as not to see defendant's restraints. On the fourth day of trial, defense counsel surprised the court by announcing that defendant would testify. The court called for a short break, and the following colloquy began:

> *Defense Counsel*. Your Honor, I don't have a problem with it. He admits he's in jail; he's in jail now. We aren't trying to hide that.
>
> *The Court*. All right.
>
> *Defense Counsel*. So, I – I have no problem with that.
>
> *The Court*. All right.

*Defense Counsel*. So – so, just unchain him so he can go --

*Defendant*. Yeah.

It is clear from this record that defendant waived his right not to be shackled before the jury.

## 4. CUMULATIVE ERROR

"The cumulative effect of several minor errors may warrant reversal where the individual errors would not." *People v Ackerman*, 257 Mich App 434, 454; 669 NW2d 818 (2003). "In order to reverse on the grounds of cumulative error, the errors at issue must be of consequence. In other words, the effect of the errors must have been seriously prejudicial in order to warrant a finding that defendant was denied a fair trial." *People v Knapp*, 244 Mich App 361, 388; 624 NW2d 227 (2001) (internal citation omitted). We agreed with only two of defendant's nine claims of ineffective assistance and for those claims, determined that defendant was not prejudiced. Defendant's cumulative error argument fails.

The trial court's decision to deny defendant a new trial based on ineffective assistance of counsel was not an abuse of discretion. The trial court's finding that trial counsel was not ineffective was within the range of principled outcomes given that trial counsel provided ineffective assistance in only one of the nine instances argued, and that even in that one instance, the error was not outcome determinative.

## III. PROSECUTORIAL MISCONDUCT

### A. ISSUE PRESERVATION

Claims of prosecutorial misconduct are preserved by "contemporaneous objection or request for a curative instruction in regard to any alleged error." *People v Brown*, 279 Mich App 116, 134; 755 NW2d 664 (2008). Defendant's claims are not preserved because he did not object at trial.

### B. STANDARD OF REVIEW

Unpreserved claims are reviewed for plain error affecting defendant's substantial rights. *People v Thomas*, 260 Mich App 450, 454; 678 NW2d 631 (2004). "Reversal is warranted only when the ... error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of the judicial proceeding independent of the defendant's innocence." *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999) (citations and internal quotation marks omitted).

### C. ANALYSIS

"Given that a prosecutor's role and responsibility is to seek justice and not merely convict, the test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial." *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). "[W]e consider issues of prosecutorial misconduct on a case-by-case basis by examining the record and evaluating the remarks in context, and in light of defendant's arguments." *People v Thomas*, 260

Mich App 450, 454; 678 NW2d 631 (2004). "Prosecutors are typically afforded great latitude regarding their arguments and conduct at trial." *Unger*, 278 Mich App at 236. They are "free to argue the evidence and all reasonable inferences from the evidence as it relates to [their] theory of the case." *People v Gonzalez*, 178 Mich App 526, 535; 444 NW2d 228 (1989). Further "this Court does not believe a case should be reversed merely because a few technically improper questions are asked. In fact, it is hard to find a trial where every question is exactly proper. In order to require a reversal some prejudice or patterns of eliciting inadmissible testimony must be shown." *People v Hooper*, 50 Mich App 186, 196; 212 NW2d 786 (1973). "Appellate review of prosecutorial remarks is generally precluded absent an objection because the trial court was deprived of an opportunity to cure the error." *People v Bass (On Rehearing)*, 223 Mich App 241, 246; 581 NW2d 1 (1997). However, "reversal is warranted in the absence of an objection if a curative instruction could not have eliminated the prejudicial effect of the remarks or where failure to review the issue would result in a miscarriage of justice." *Id*.

Defendant repeats much of the same claims of error from his ineffective assistance of counsel claim, this time couched as prosecutorial misconduct. Defendant first argues that the prosecutor engaged in misconduct when she elicited testimony from Dana regarding defendant's sexual preference for anal sex. The prosecutor agrees that the testimony was improper and should not have been admitted in the context of defendant's ineffective assistance of counsel claim, but did not address the testimony in regards to whether it was prosecutorial misconduct to elicit the testimony. Regardless, we find that it was misconduct. A "prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury." *Bahoda*, 448 Mich at 298. Here, the prosecutor purposely elicited the testimony on direct exam and did not argue that it was relevant to any fact at issue. Despite its flagrancy, the testimony did not deny defendant a fair trial. The evidence of defendant's guilt was substantial. DK provided a detailed description of being assaulted that was corroborated by the spontaneous statements he made to family members. Medical testimony confirmed that he sought treatment for the pain he complained resulted from the assaults. Defendant was recorded asking witnesses to lie for him. Dana's testimony was brief in the context of the whole trial. Further, a proper objection could have cured any prejudicial effect from the testimony.

Defendant next argues the prosecutor engaged in prosecutorial misconduct for placing the issue of BK's suicide note before the jury. BK's suicide was mentioned by DK and Yoakum. In both those instances, their testimony regarding BK was unresponsive to the question posed. In DK's case, the prosecution asked if he had any other siblings and in Yoakum's case the defense asked whether DK told her when the incidents occurred. "Unresponsive answers from witnesses are generally not prosecutorial error." *People v Jackson*, 313 Mich App 409, 427; 884 NW2d 297 (2015). In any event, defendant cannot show prejudice when he planned to introduce the same evidence to his advantage to explain the context of a recorded jail phone call and the reason why he would not sexually assault DK after having just lost a son.

Defendant also argues that the prosecutor engaged in prosecutorial misconduct when she placed the testimony of Harper, Nurse Yoakum and Officer Koza before the jury because it was hearsay and vouched for DK's credibility. Defendant's argument for this issue is three sentences: "The prosecution tried this case as if the general rule on hearsay did not apply. The is [sic] covered by *People v Douglas* and *People v Shaw*. In its closing, the prosecution used the hearsay to bolster DK's credibility (TT IV 960-968, 997)." There is no discussion of the merits

of the error or how defendant was prejudiced. "It is axiomatic that where a party fails to brief the merits of an allegation of error, the issue is deemed abandoned by this Court." *Prince v MacDonald*, 237 Mich App 186, 197; 602 NW2d 834 (1999). In any event, defendant cannot establish that he was prejudiced by the hearsay testimony when it was a vital part of his trial strategy for the jury to hear DK's multiple accounts of the assaults in order to argue their inconsistencies and therefore attack DK's credibility.

Defendant additionally argues it was prosecutorial misconduct for the prosecutor to misrepresent Dr. Stringer's testimony to implicate that DK's urinary problems and genital issues were the result of trauma. "[A] prosecutor may not argue facts not in evidence or mischaracterize the evidence presented, the prosecutor may argue reasonable inferences from the evidence." *People v Watson*, 245 Mich App 572, 588; 629 NW2d 411 (2001). As stated in relation to defendant's ineffective assistance of counsel claim, the prosecutor did not misrepresent Dr. Stringer's testimony when the doctor testified that the jury could rule out the other two causes with a high degree of certainty.

We similarly reject defendant's cumulative error argument on the basis that there are no errors to aggregate.

## IV. JURY COMPROMISE

### A. STANDARD OF REVIEW

Defendant argued that the jury verdict was compromised as a basis for the trial court to grant him a new trial. We review a trial court's decision on a motion for a new trial for an abuse of discretion. *People v Rao*, 491 Mich 271, 279; 815 NW2d 105 (2012); *People v Lemmon*, 456 Mich 625, 648 n 27; 576 NW2d 129 (1998). "An abuse of discretion occurs when the trial court renders a decision falling outside the range of principled decisions." *Rao,* 491 Mich at 279. "This Court reviews de novo questions regarding inconsistent verdicts, which are constitutional issues." *People v Russell*, 297 Mich App 707, 722; 825 NW2d 623 (2012).

### B. ANALYSIS

Defendant argues that his verdicts were inconsistent because the jury acquitted him of one of the alleged assaults and found him guilty of the other. He argues that the verdict was achieved as the result of compromise for the same reason. He additionally argues that the inconsistent verdicts were the result of juror confusion because the jury's request for a time line during deliberations indicated that it was confused over the offense dates. The trial court's opinion and order after the *Ginther* hearing did not address defendant's challenge to the jury verdict.

Inconsistent verdicts, where the "acquittal of one charge renders it seemingly impossible for the jury to have found the existence of all elements of the charge on which it convicts," may result from jury compromise, jury confusion or leniency. *People v Davis*, 320 Mich App 484, 491; 905 NW2d 482 (2017), app gtd in part 501 Mich 1066; 910 NW2d 301 (2018); *People v Lewis*, 415 Mich 443, 450–452; 330 NW2d 16 (1982). Reversal is warranted in the case of compromise or confusion. *Lewis*, 415 Mich at 451-452, 450 n 9. The prejudice posed from an inconsistent verdict resulting from jury compromise is the risk that some of the jurors did not

believe beyond a reasonable doubt that defendant committed the underlying offense, but nonetheless agreed to convict him in exchange for defendant's acquittal of other charges. *Lewis*, 415 Mich at 451–452. In the case of confusion, when there is evidence that "the jury was confused, did not understand the instructions, and did not know what it was doing," both verdicts are tainted. *Id*. at 450 n 9. "If the jury was lenient, the defendant was not prejudiced by the inconsistency in the verdicts and has no cause for complaint." *Id*. at 451. "[T]he mercy-dispensing power of the jury may serve to release a defendant from some of the consequences of his act without absolving him of all responsibility." *People v Vaughn*, 409 Mich 463, 466; 295 NW2d 354 (1980).

"Juries are not held to any rules of logic nor are they required to explain their decisions." *Id*. "Because the jury is the sole judge of all the facts, it can choose, without any apparent logical basis, what to believe and what to disbelieve." *People v Chamblis*, 395 Mich 408, 420; 236 NW2d 473 (1975). "Consistency in the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment." *Dunn v United States*, 284 US 390, 393; 52 S Ct 189; 76 L Ed 356 (1932) (citations omitted.) "Narrowly viewed, a jury's acquittal on one charge in a multi-count indictment signals no more than the jurors' agreement not to convict on that charge for whatever reason satisfactory to them." *People v Lewis*, 415 Mich 443, 450; 330 NW2d 16 (1982).

We are not persuaded that defendant's verdicts were the result of jury compromise. In *Graves*, our Supreme Court noted the following "sufficiently persuasive indicia of jury compromise" that if present, might warrant reversal in certain circumstances:

> 1) logically irreconcilable verdicts are returned, or 2) there is clear record evidence of unresolved jury confusion, or 3) . . . where a defendant is convicted of the next-lesser offense after the improperly submitted greater offense. [*Graves*, 458 Mich at 488].

Here, the verdicts are not so logically irreconcilable that reversal of defendant's convictions is warranted. There were two independent incidents of assault and the jury was instructed to consider each count separately. The jury could have believed that there was not enough evidence of the second assault.

Additionally, there was no evidence that the jury was confused. Defendant's only evidence that the jury was confused is that it asked for a "time line sheet." Defendant infers the jury was confused about the offense dates from this request. Defendant's argument is pure conjecture and not supported by the record. Within minutes of retiring to the jury room, the jury requested not only the time line sheet, but "all evidence, time line sheet, and sound files, pictures, exhibits." This is a sign of a jury intent on following its charge, not one that was confused or misled.

Affirmed.

/s/ David H. Sawyer
/s/ Cynthia Diane Stephens
/s/ Michael F. Gadola

-15-